UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CRIMINAL ACTION NO. 1:12CR-00012-JHM

UNITED STATES OF AMERICA                                                    PLAINTIFF

VS.

CHARLES STINSON
RALPH DOWELL
LOGSDON VALLEY OIL COMPANY, INC.                                  DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a motion by Defendant, Charles Stinson, to prohibit Agent Libby Zuege from introducing the alleged statements of co-defendant Ralph Dowell [DN 61] and upon a motion by Defendant, Ralph Dowell, to sever the defendants, or in the alternative, to exclude co-defendant statements at trial [DN 62]. Fully briefed, this matter is ripe for decision.

### BACKGROUND

On March 14, 2012, Charles Stinson, Ralph Dowell, and Logsdon Valley Oil Company, Inc., were indicted for conspiring to commit violations of the underground injection control program and substantive violations of the underground injection control program beginning in March of 2008. Stinson is the owner and operator of the Logsdon Valley Oil Company, Inc., and operates several oil wells in Hart County, Kentucky. Ralph Dowell was an employee of Stinson's oil production business. The indictment alleges that the Defendants injected fluids into sinkholes without permits in violation of the Safe Drinking Water Act, 42 U.S.C. § 300h-2(b)(2) and 40 C.F.R. § 144.11.

On June 29, 2010, Environmental Protection Agency Special Agent Libby Zuege separately interviewed Charles Stinson and Ralph Dowell as part of the investigation on the site of one of the

1

oil leases in question. According to Agent Zuege's notes, Defendant Dowell indicated that Stinson was aware of at least some of the violations in question. During Defendant Stinson's interview with Agent Zuege, Stinson identified Dowell as one of his employees and later in the interview when asked who could have configured the well indicated that it had to be his workers.

Defendants Charles Stinson and Ralph Dowell move the Court to prohibit the introduction of the testimony of Agent Zuege arguing that statements given by their codefendant would violate their Sixth Amendment right of confrontation as discussed in Bruton v. United States. Dowell also moves to sever the joint trial of the Defendants for the same reasons.

## LAW

"Persons jointly indicted should, as a general rule, be tried together, for 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" United States v. Anderson, 89 F.3d 1306, 1312 (6th Cir. 1996)(quoting United States v. Phibbs, 999 F.2d 1053, 1067 (6th Cir. 1993)). Fed. R. Crim. P. 14 allows the trial court to order severance of defendants where it appears that joinder of defendants prejudices a defendant or the government, even though initial joinder was proper under Rule 8. Whether there is sufficient prejudice in joinder to warrant separate trials is a question committed to the sound discretion of the trial court. The trial court will not be reversed on appeal absent a showing of abuse of discretion.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI. In Bruton v. United States, the Supreme Court held that statements of non-testifying codefendants which incriminate the defendant on their face violate the Constitution, regardless of any limiting instruction. 391 U.S. 123, 132 (1968). See also United States v. Truss, 2006 WL 1006528, *4

(E.D. Tenn. April 14, 2006). Unless the Government "wishes to hold separate trials or to use separate juries or to abandon use of the confession, [the prosecutor] must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found." Gray v. Maryland, 523 U.S. 185, 192 (1998).

"[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence. . . ." Richardson v. Marsh, 481 U.S. 200, 211 (1987). Significantly, Bruton does not bar the use of a redacted codefendant's confession "even if the codefendant's confession becomes incriminating when linked with other evidence adduced at trial." United States v. DiCarlantonio, 870 F.2d 1058, 1062 (6th Cir. 1989). See also Richardson, 481 U.S. at 208. However, "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that, in our view, the law must require the same result." Gray, 523 U.S. at 192. The Supreme Court reasoned that "statements redacted in such a way [are] often obvious to the jury, unnecessarily [alert] the jury to the redacted name, and directly [accuse] the co-defendant." United States v. Winston, 55 Fed.Appx. 289, 293-94 (6th Cir. Jan. 23, 2003)(citing Gray, 523 U.S. at 193-194). See also Truss, 2006 WL 1006528, *4.

## DISCUSSION

### A. Dowell's Statement

Stinson moves to prevent the introduction of Dowell's entire statement. Stinson argues that since the Defendants are charged with a conspiracy and with individual acts of aiding and abetting

3

each other to violate the Safe Drinking Water Act, the entirety of Dowell's statement incriminates Stinson and Logsdon Valley Oil Company regardless of whether they are mentioned by name or not. Stinson claims that no redaction can effectively eliminate Stinson's and Logsdon Valley Oil Company's existence. Instead, the statements will still be imputed to Stinson and his company, because Dowell is the employee who actually works with the oil production. For example, Stinson maintains that Dowell's admission that the pipe in question had been discharging for a long time and that the injection well never worked right incriminate Stinson because Stinson is the owner of the company and the longer the problem occurred the more likely he was aware of the violations. Additionally, Stinson points to the utilization of "we" and "they" throughout Dowell's statement as violating Bruton. Further, Stinson claims that the following statements are also violations of Bruton: Dowell thought Stinson observed the overflow, Dowell provided Stinson with routine reports about production, and two other wells were illegally discharging.

In response, the United States argues that the statement is either not facially incriminating or can be effectively redacted to address any possible Bruton issues. The United States suggests redacting the statement by replacing "they" with "he" and the use of the term "another person" or "other people" in place of "Stinson" or "him." The United States maintains that limiting instructions can be utilized to eliminate any possible prejudice as well.

Courts have recognized that in some instances the replacement of a defendant's name with a neutral pronoun may avoid a Bruton violation. See, e.g., Winston, 55 Fed. Appx. at 294-296; United States v. Taylor, 186 F.3d 1332, 1335-36 (11th Cir.1999)(defendants' names replaced with "they" or the "captain"). However, in examining the statement in the present case, the Court finds that the substitution of these words for Stinson's name still leads to an improper inference that

4

Stinson was named in Dowell's statement. Clearly, Stinson owns Logsdon Oil. No reasonable juror could hear the proposed redacted statement without inferring that Defendant Stinson's name has been omitted. In other words, just as in Gray, "[t]he inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." Gray, 523 U.S. at 196. See also Stanford v. Parker, 266 F.3d 442, 457 (6th Cir. 2001)(the replacement of "Stanford" with "the other person" in the codefendant's confession violated Bruton).

Notwithstanding, it appears to the Court that the statement of Defendant Dowell can be redacted it such a way as to comply with Bruton and Gray. The Court will require the following redactions:

> DOWELL identified another worker in his truck as SCOTT WALTER, who remained in the truck for only part of the interview. DOWELL stated that he worked for STINSON for a long time. He admitted that the pipe in question had been discharging for a long time. He thought that it might have started during 2007 when the pipe broke ~~and they never bothered to fix it~~. He explained that the "sulfur water" was supposed to be sent to a permitted injection located just a bit further than the sinkhole but the injection well never worked right and it always was plugged up. He stated that ~~they~~ [it was] just allowed ~~it~~ to overflow into the sinkhole. He stated that he never discussed it with STINSON ~~but he was sure that he knew~~. He explained that one would easily know if an injection well was not operating because you could see it and hear it if it was running. He stated that the injection well would run properly for about a week before it would back up and get clogged. ~~He also thought that there were times in which STINSON saw the injection well overflow. All of this would have also made him aware that there were problems with the injection well.~~
>
> DOWELL identified JAMES BRADLEY and his son, DONNIE DOWELL, as other workers employed by STINSON. DOWELL estimated that the well that pumped to the tank battery in question pumped 95% brine and 5% oil. ~~He advised that he would give STINSON a weekly gauge report of how much oil was produced.~~ DOWELL stated that there were 2 other wells that have been discharging illegally to sink holes. He stated that they were both on the PAYTON PLACE. He stated that the piping configuration was purposefully configured to go to sinkholes. He stated that he knew

5

it was wrong to pump into sinkholes. He stated that everyone knows that brine is not supposed to be disposed of in a sinkhole and that in general brine has to be disposed of properly. He stated that he was not aware that the well in question was operating and that he thought that it was shut off. He acknowledged ~~that they had been caught illegally discharging recently and~~ that the well was supposed to be shut off. He went and pulled the fuse for the well so that the well would not be pumping. He stated that JAMES or someone else might have turned it on, but he did not know. He worked for ERNEST STINSON, father of CHARLES, prior to ERNEST turning over the leases.

**B. Stinson's Statement**

While Dowell concedes that Stinson's statement does not directly implicate Dowell, Dowell argues that if the jury credits Stinson's statement, one reasonable conclusion the jury could draw is that Dowell was responsible for at least some of the alleged violations because of his employment by Stinson. Specifically, Dowell points to Stinson's reference to him as an employee and then Stinson's later allegation that his workers configured the line for the tank battery in question. Additionally, Dowell contends that because of the broad and sweeping charges alleged in the indictment, any statement Stinson made to investigators about the company, the wells, and compliance issues could be used as evidence by the jury when assessing the charges against Dowell.

In response, the United States argues that the only statement Defendant Charles Stinson made concerning Dowell was that Dowell and James Bradley worked for Stinson. The United States maintains that it can independently establish that Dowell was an employee of Stinson and Stinson's father for a number of years. Additionally, the United States contends that Stinson's admission that one of his workers must have configured the wells does not facially incriminate any worker by name and should be admissible. Alternatively, the United States argues that if the Court were to consider the statement to be facially incriminating, the United States proposes redacting the statement by substituting "another person" for the references by Stinson to Dowell.

6

While the statement does not facially incriminate Dowell, the Court finds that the redaction of Stinson's statement is necessary to comply with the requirements of Bruton. Stinson identified Dowell as his current employee, accused his "workers" of configuring the line from the tank battery to the sink hole, admitted he instructed his "workers" to configure the lines in a certain manner so that oil would not spill out into the ground, and Dowell is the only other individual charged in the indictment. Without redaction, a jury could immediately infer that Stinson implicates Dowell in the violation of the Safe Drinking Water Act. Furthermore, the replacement of Dowell's name with "another person" likewise still leads to an improper inference that Stinson implicated Dowell in his statement. It appears to the Court that the statement of Defendant Stinson can be redacted in such a way as to comply with Bruton and Gray. The Court will require the following redactions:

> STINSON advised that he is the owner and operator of LOGSDON VALLEY OIL, INC. leases. The tank battery identified as UIC I-0590 [Carter-Chaney] was witnessed discharging directly to a sinkhole just minutes earlier before STINSON'S arrival. He advised that he was not aware that the well was being pumped which in return meant that he did not know that oil and produced water were being sent to the tank battery. He stated that he had been talking weekly to CAROL CHEN in Atlanta with the EPA and that he was doing all the things she had been asking him to do. He stated that he keeps pumping records for each of his leases that he pumps. There are currently 9 wells on this lease. There used to be 28 but 19 have been disassembled and are no longer in use. He has 3 permitted injection wells on the property and uses all 3. He also injects fluids from other leases into one of his injection wells and stated that he is permitted to accept this water. He identified RALPH DOWELL and James Bradley as 2 of his employees although he clarified that he had just fired Bradley a day or two before for not working. He stated that the brine or produced water was not supposed to be running down the hill into the sinkhole, but was supposed to be going into their injection well. He acknowledged that he had been caught during May 2010 for illegally discharging and stated that he was talking to DAVID YATES, a construction man, about getting a bulldozer and clearing out the area of the sinkhole and cleaning it up. He was advised that he could not push the material into the sinkhole. STINSON stated that he took over the leases in question sometime during the 1990's, after his father was convicted of a federal crime in which he was caught illegally discharging brine into a unpermitted injection well. He acknowledged that he was supposed to operate the wells in accordance with the law. He stated that his workers bring him daily worksheets for each well and that he

7

routinely performs 15 second tests in two locations to verify the flow rates. He tests them at the well head and also at the oil water separator.

He advised that prior to May 24, 2010, he was not aware that the tank battery in questions was discharging into the sinkhole. He stated that he walked into the area for the first time when WELLER and DWIGHT CARDWELL, KDEP, were there on 5-24-10. He stated he did not know about it prior to that date but did after that date. STINSON also advised he had been in Frankfort, KY on Monday, June 28, 2010, just the day before, for a meeting with the Enforcement Division of the KDEP in regard to the May 2010 illegal discharging of this same tank battery. He advised that he had been taking the corrective measures that they had set forth but could not explain why this tank battery was discharging. He had no idea who turned on the well or could have done it. He stated that anyone could have come by and turned on the pump jack which would have started the entire process that would eventually cause the discharge from the tank battery. He stated that KERRY McDANIEL, former KDEP employee was helping him with the matter.

STINSON was asked directly if he had ever been cited for illegal discharges prior to May 2010, and he stated that he had and thought that it was by SCOTT SHARP, KDEP, during 2007. He stated that he thought that it was winter time and that he line from the tank battery to the injection well had become disconnected. He acknowledged that indeed he had known about the tank battery discharging to the sink hole prior to May 2010, but explained that he had never gone down into the woods himself to see it. He stated that he hauls brine water from Warren County to his site and the names associated with the other leases are GRUBBS AND CASSITY, but he could not recall the actual names of the leases.

He was advised that it appeared that this tank battery had been discharging for a long period of time into the sinkhole and he stated that he just didn't know anything. ~~He was asked as to who would have configured this and he stated that it had to have been his workers.~~ At this point in the interview, RALPH DOWELL and SCOTT WALTERS arrived. DOWELL is an employee and WALTERS is the son in law of STINSON. The interview took a break at this point and restarted after DOWELL and WALTERS left. STINSON was asked if the agent above could visit the other well and tank battery sites. STINSON advised that he had no problem with this and offered to show the agent and WELLER the locations. The invitation was accepted and STINSON drove his truck to each location and the agent above accompanied by WELLER went to the locations. Each location was photographed and will be included in a photo log.

STINSON could not identify each location by name or number, but WELLER assisted in this endeavor and STINSON agreed with him at each location. Initially STINSON stated that there were no other locations that were configured to drain to sinkholes, but that story changed after the visits to each location. He was asked about

being cited by KDEP for exactly this and at first he said no, but then he said he had three locations, and eventually he acknowledged that he had 4 of his 9 tank battery's piped so that their produced water "could possibly" drain to sink holes. ~~He again stated he did not know if they were draining to sinkholes but acknowledged that he told his workers to configure them this way so that oil would not spill out onto the ground.~~ He referred to this piping configuration as a safety leg. He acknowledged that the produced water should not be sent to a sinkhole and not into a pond which he had done at one of the locations. He stated that he was making all of the changes that need to be done to operate the right way, but that he just couldn't explain why the other well was operating even after he got caught before.

## CONCLUSION

Having found the redactions discussed above sufficient to safeguard Dowell and Stinson's Sixth Amendment rights, **IT IS HEREBY ORDERED** that the motion by Defendant Dowell to sever the joint trials of the Defendants [DN 62] is **denied** and the motions by Defendant, Charles Stinson and Ralph Dowell, to exclude co-defendant statements at trial [DN 61, DN 62] are **denied**.

Joseph H. McKinley, Jr., Chief Judge
United States District Court

August 20, 2013

cc: counsel of record

.